**624**

MEMBERS OF the BRIDGEPORT
HOUSING AUTHORITY POLICE
FORCE et al., Plaintiffs,

v.

CITY OF BRIDGEPORT et
al., Defendants.

Civ. B–77–130.

United States District Court,
D. Connecticut.

Jan. 29, 1980.

On Intervening Plaintiffs' Motion for
Preliminary Injunction Feb. 14, 1980.

David T. Rosen, Rosen, Dolan & Koskoff, New Haven, Conn., Michael P. Koskoff, Beverly J. Hodgson, Koskoff, Koskoff & Bieder, Bridgeport, Conn., for Arthur Carter et al.

Mark F. Gross, Bridgeport, Conn., for Gross, Rainieri, Williams, Mainiero, Lugo and Haywood.

Joseph A. Siciliano, Stratford, Conn., for Housing Authority, Williams, Mainiero, Lugo, Rainieri, Gross as Com'r of Housing Authority, and Heyward as Executive Director.

Gerald A. Hefferman, Kopkind, Flynn & Raccio, New Haven, Conn., for Local 1199.

J. Daniel Sagarin, Bridgeport, Conn., for intervening defendants.

Richard Blumenthal, U. S. Atty., Cheryl B. Wattley, Asst. U. S. Atty., New Haven, Conn., Alice Daniel, Acting Asst. Atty. Gen., Paul Blankenstein, F. James Foley, Attys., Dept. of Justice, Washington, D. C., for Dept. of Labor, Ray Marshall, Dept. of H.U.D. and Jay Janice, Acting Secretary of H.U.D.

Jack Samowitz, City Atty., Thomas W. Bucci, Bridgeport, Conn., for City of Bridgeport, John Mandanici, Joseph Walsh, Members of Bd. of Police Com'rs, Civil Service Com'n members and Allen Cohen.

## MEMORANDUM OF DECISION

### INTRODUCTION

DALY, District Judge.

This action is brought by the members of the Bridgeport Housing Authority Police Force against the City of Bridgeport and its Mayor, Director of Civil Service, Civil Service Commission, Superintendent of Police, Board of Police Commissioners, the Bridgeport Housing Authority, Director of the Housing Authority, the Bridgeport Area Manpower Consortium and its Director, the United States Department of Labor, and the United States Department of Housing and Urban Development and its Secretary. Plaintiffs claim violations of 42 U.S.C. §§ 1981 and 1983; the Demonstration Cities and Metropolitan Development Act of 1966 (Model Cities), 42 U.S.C. §§ 3301 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; and the Comprehensive Employment and Training Act

(CETA), as amended by the Comprehensive Employment and Training Act Amendments of 1978, P.L. 95–524, 92 Stat.1909, 29 U.S.C. §§ 801–999. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The plaintiffs seek a determination that the differences in terms and conditions of employment between their positions and those in the Bridgeport Police Department are illegal and unconstitutional. They have requested that the Court order them incorporated into the Bridgeport Police Department or designated a Housing Authority Police Force pursuant to Conn.Gen.Stat. § 8–44b on a par with the Bridgeport Police Department, and accorded civil service status. They also seek damages, costs and attorney's fees.

After a hearing in February and March of 1979, this Court granted plaintiffs' motion for a preliminary injunction restraining the City's Employment and Training Administration from terminating four plaintiffs as CETA participants. After a hearing in September, 1979, on plaintiffs' motion for an injunction restraining the City from terminating plaintiffs on September 20 when their CETA eligibility expired, the Department of Labor granted a waiver of the eligibility requirements under CETA, which extended plaintiffs' eligibility for three months, and the motion accordingly was withdrawn.

The Court granted plaintiffs' motion for a bifurcated trial, and the issue of liability was tried to the Court on December 11 and 14, 1979. By order of the Court, with the consent of the parties, the evidence received at the earlier preliminary injunction hearings was made part of the trial record.

## FACTS

### I. *Administrative Remedies.*

Plaintiffs filed administrative complaints under Title VII with the Equal Employment Opportunity Commission (EEOC) and the Connecticut Commission on Human Rights and Opportunities on or about August 19, 1976, and received their Notices of Right to Sue From the EEOC in April, 1978. PX 52–54.[1] On June 9, 1978, plaintiffs received permission to amend their complaint to add allegations of Title VII violations.

Plaintiffs also sent a complaint to the Department of Housing and Urban Development (HUD) on May 30, 1978, calling HUD's attention in particular to the alleged Model Cities Act violations. PX 56. On the same day they sent a complaint to the City's Employment and Training Administration, calling its attention to the CETA violations. On May 14, 1979, plaintiffs complained again to the City's Employment and Training Administration, which still took no action. Accordingly, on July 25, 1979, plaintiffs by letter requested the Department of Labor to take jurisdiction of their complaint. The Department of Labor did not respond to plaintiffs' request; but the City, on August 9, 1979, purported to deny plaintiffs' complaint without a hearing. PX 55, 57–60. The Department of Labor has never responded to plaintiffs' complaint of July 25, apparently because the official responsible for conducting the investigation never received it, although it was properly addressed and mailed. Testimony of Mr. Thompson, 12/11/79. As a result, the Department of Labor has never seen plaintiffs' complaint; and although it knew of the complaint when it received a copy of the City's response in August, at the time of trial it had not yet begun to investigate the complaint. *Id.*

Plaintiffs at this point do not have any effective administrative remedies, since they are threatened with termination of their employment and the Department of Labor has not even begun investigation of their eighteen-month old CETA complaint. Similarly, they have no effective administrative remedy under the Model Cities Act because HUD has not acted on their complaint and the City is no longer receiving Model Cities funds; the administrative remedy of fund termination is thus unavailable as well as unhelpful to plaintiffs.

1. "PX" refers to plaintiffs' exhibits, "DX" to defendants' exhibits. Live testimony is referred to by both date and page, where available.

## II. *History of the Housing Police.*

Bridgeport has seven public housing projects: P. T. Barnum, Marina Apartments, Father Panik Village, Marina Village, Harbor View, Fireside and Green Homes. All were constructed between 1940 and 1960 except Harbor View, which is approximately seven years old. P. T. Barnum, Marina Village, Green Homes and Father Panik Village are low income projects and are approximately 95% Black and Puerto Rican. The residents of Harbor View and Fireside are elderly and almost all white. The housing projects have a total population of approximately twelve thousand, of which approximately ten thousand live in the low income projects.

All the housing projects are administered by the Bridgeport Housing Authority, which was established in 1949 according to Conn.Gen.Stat. § 8–40, and thereafter activated by the City of Bridgeport. Under state law, the Bridgeport Housing Authority is a public corporation created by the City of Bridgeport for the purpose of planning, creating and administering Bridgeport's housing projects. The housing projects that it creates and administers are part of the City of Bridgeport. Municipal services such as schools, fire protection, sanitation, and other services except police protection are provided by the City of Bridgeport in the same manner as for other regions of the City.

The Housing Police began full-fledged operation in 1970. Prior to that time a small number of persons were employed by the Housing Authority as guards. In 1970 a unit of twenty officers was established in Father Panik Village. Because of the success of the initial group of officers the force was expanded to other projects, and the number of officers increased, reaching a high of 52 in 1974, when the last class of officers was hired. All previous classes had been hired between 1970 and 1973. No officers have been hired since 1974, and the Housing Police Force now consists of approximately twenty-seven officers.

Funding for the Housing Police in their early years came from a variety of sources, since 1971 primarily under the Model Cities Act. The Housing Authority, which is now and has been for some time operating on a deficit budget, provided an office but no money for salaries. By the time of expiration of the Model Cities Act in 1975, 42 U.S.C. § 3311, Model Cities funds were being used to fund all the Housing Police positions. Upon the expiration of the Model Cities Act, the City assumed responsibility for funding the Housing Police for one year and then refused to continue them, claiming lack of resources in view of a municipal fiscal crisis. PX 39. With the exception of the three or four plaintiffs who have been funded by the Housing Authority [1a], the plaintiffs were then funded as CETA participants, and they remained in this status, despite the assertions of City officials that CETA funding could only be a transitional funding source. Plaintiffs' funding under CETA has been supplemented by City funds received under the "block grant" provisions of the Community Development Act, 42 U.S.C. §§ 5301 *et seq.* Plaintiffs' CETA eligibility has now expired, as of December 31, 1979, and the Housing Authority does not have, nor has it ever had, funds to pay their salaries. The three or four plaintiffs paid by the Housing Authority will continue to be so paid through September, 1980; the remainder are presently being paid by the City out of HUD block grant funds. The City, however, has indicated no intention of giving plaintiffs' positions a permanent place in its budget, despite the fact that it is now operating with a budget surplus rather than in a fiscal crisis.

## III. *Duties of the Housing Police.*

The Housing Police perform the duties of police officers within their beat, the City's housing projects. Their duties are identical to those of a Bridgeport Police Department Patrol officer and include investigation of

---

**1a.** It is not clear from the record when the Housing Authority began funding these three or four positions.

crime, apprehension of suspects, maintenance of order, and so forth; their arrest powers, however, are presently limited, due to their classification by the City as "special police." The duties performed by the Housing Police require the same skill, effort and responsibility as those of the Bridgeport Police Department Patrol officers, and are performed under similar working conditions, except that plaintiffs have an exceptionally difficult and dangerous assignment. The housing projects are low income and high crime areas. Violent crimes, such as robbery and murder, and narcotics offenses occur several times more frequently in the housing projects than in the rest of the City. PX 74 at 33–4.

The Housing Police have received training equal to that of Bridgeport Police Officers. All the Housing Police classes but one received training equal in length and content to that of the Bridgeport Police Department trainees, and in some cases in the same classes. The Housing Police officers in one class were put into the field after a shorter training course because they were urgently needed. They have learned from on the job training and experience, and have received certificates from the State of Connecticut certifying their completion of 1000 hours of on the job training. They perform with competence equal to that of their fellow Housing Officers and Bridgeport Police officers. Testimony on the matter at trial was unanimous that plaintiffs do the same work as any other patrol officers in the City of Bridgeport and do it very well. The witnesses agreed that plaintiffs' work was excellent.

IV. *Supervision and Control of the Housing Police.*

The Housing Police are supervised and controlled by the Bridgeport Police Department. They are under the command of a Bridgeport Police Department Sergeant, who reports to his superiors within the Bridgeport Police Department. It is from the Sergeant, and thus from the Bridgeport Police Department, that the Housing Police receive orders, assignments, supervision, control and discipline, including suspension and discharge. They are subjected to supervision, control and discipline under the same terms and according to the same standards as Bridgeport Police Department officers.[2]

The Housing Police were determined by the State Labor Board to be employees of the Housing Authority, with whom they were negotiating a contract at the time, for purposes of bargaining. *City of Bridgeport v. Bridgeport Housing Police Local 1303*, Case No. MPP–3081, Decision No. 1492 (Conn. Bd. of Labor Relations, Feb. 1, 1977), *appeal dismissed*, No. 115665 (C.P., Fairfield Cty., Jan. 31, 1978). However, the Housing Authority has no control over the wages paid plaintiffs, the amounts of which have always been and still are determined by the City. The Housing Authority has agreed that plaintiffs should be paid in parity with Bridgeport Police Department officers, but this agreement has no effect since the Housing Authority does not determine wage rates. PX 69.

The City of Bridgeport thus exercises control over every meaningful aspect of plaintiffs' employment. The Housing Authority, for some purposes the plaintiffs' nominal employer, does not even issue their pay checks.

V. *Service by the Housing Authority Police.*

The Housing Police have received rare unanimity of praise from the community they serve, the Bridgeport Police Department officers they work with, City officials, and Housing Authority officials. They are universally recognized as having worked a tremendous improvement in the lives and physical safety of the housing projects residents. They are viewed as essential by the residents, the Housing Authority officials, and City officials.

---

2. *See, e. g.*, PX 24, a series of orders issued by Bridgeport Police Department Sergeant Cafferty regulating procedures for writing reports, fueling police cars, and reporting cases of sickness or injury; PX 67 regarding Housing Police time off. *See also* testimony of Sgt. Cafferty 12/11/79.

Replacement of the Housing Police by Bridgeport Police Department officers is not feasible for three reasons. First, the Bridgeport Police Department is now understaffed; Superintendent Walsh testified in September that its strength was 401, compared with an authorized strength of 498 and a budgeted strength of 458 (9/21/79 at 104–5). Attrition continues and the current appointment list has expired, which means that it would be at least a year before new officers could be appointed (9/21/79 at 86 *et seq.*). These officers would then have to undergo a full training course before being assigned. Realistically, then, new personnel would not be available until the middle of 1981 at the earliest, and the City has not indicated any intention even to begin the hiring process, so that assignment of newly hired officers probably would be delayed even further.

Second, community residents and Housing Authority officials agree that the Bridgeport Police Department would be most unlikely to provide adequate police protection for the housing projects. Before the Housing Police were formed, the Bridgeport Police Department officers rarely entered the housing projects, and problems in obtaining assistance from them have continued. *See, e. g.*, PX 37. During a two-week work stoppage by the Housing Police, the Bridgeport Police Department attempted to police the projects, but according to community residents they were unable and even unwilling to patrol or respond to complaints, even when gunfire occurred in the streets of the projects.

Third, the Housing Police have developed an irreplaceable expertise about and knowledge of the community they serve. Their familiarity and rapport with the residents of the projects makes their continued employment necessary to efficient law enforcement. Mayor Mandanici has referred to the Housing Police as a "needed service," and acknowledged that their elimination would result in an "escalation in the incidence of crime." PX 39. *See also* PX 21 (comparison of housing projects before and after formation of Housing Police).

## VI. *The City's Actions.*

**A.** *Housing Police conditions of employment.* The Housing Police receive substantially lower pay than Bridgeport Police officers. They have fewer fringe benefits and no effective retirement plan, while the Bridgeport Police Department has generous provisions for retirement after twenty years of service. They have almost no opportunity for promotion, since the highest Housing Authority position is supervisor, a position subordinate to a Bridgeport Police Department Sergeant. The Housing Police have no job security; no Bridgeport Police Department officer has ever been permanently terminated for lack of funding, at least within the forty-year tenure of Police Superintendent Walsh. (9/21/79 at 100.)

**B.** *Racial composition of the Housing Police and the Bridgeport Police Department.* The Housing Police are all black or Puerto Rican. The Bridgeport Police Department is approximately 87% white and 13% minority (Black and Hispanic). (9/21/79 at 89.) The City of Bridgeport is approximately 41% minority and 59% white. PX 81 at 98.

These disparities arose because the Bridgeport Police Department for many years excluded minorities from their ranks through practices that did not end until after almost all the plaintiffs were hired onto the Housing Police Force. The Housing Police, by contrast, were hired in conformity with the procedures mandated by the Model Cities Act, including affirmative action and preference for residents of model cities neighborhoods. Thus most of the plaintiffs were excluded from Bridgeport Police Department jobs when they looked for employment as police officers, and they accepted the jobs that were then available as Housing Police.

After nearly all the plaintiffs were hired the Bridgeport Police Department recruited minority officers because it was required to do so by order of this Court in *Bridgeport Guardians v. Members of Civil Service Commissioners*, 354 F.Supp. 778 (D.Conn.) *aff'd in part & rev'd in part*, 482 F.2d 1333 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95

S.Ct. 1997, 44 L.Ed.2d 481 (1975). Tests were given in 1974 and 1977, and half the officers hired since 1974 have been minority.

Plaintiffs, however, at no time have been offered employment in the Bridgeport Police Department, except in cases in which they scored so high on the tests given in 1974 and 1977 that they were eligible for appointment as members of the general public.

C. *Matters relevant to the Model Cities Act, 42 U.S.C. § 3301 et seq.* Beginning in 1971, all the Housing Police positions were funded in whole or in part by supplemental or other HUD funds. The City formally endorsed and adopted the requirements and policies of CDA Letter Number 11 [3] by resolution of the City's Common Council on April 22, 1971. The City, in addition to agreeing to abide by and implement CDA 11, included in at least one of its contracts with the Housing Authority regarding funding for the Housing Police a provision that CDA 11 was mandatory. PX 28, 29. Hiring for the Housing Police was conducted in accordance with CDA 11, under the supervision of the Bridgeport Police Department.

The City has not incorporated plaintiffs' jobs into its regular civil service system. It has, instead, asserted that it was attempting to resolve the problem of the permanent status of the Housing Police, but has failed to do so.

The Housing Authority's efforts under CDA 11 do not seem to have been much more strenuous than the City's. The Housing Authority did resolve to establish a Housing Authority Police Force under Conn.Gen.Stat. § 8–44b; but its efforts to comply with the Model Cities requirements seem to have stopped there. The record does not reveal any attempts on the part of the Housing Authority to negotiate with the City in order to effectuate its resolution.

In addition to agreeing to comply with CDA 11 as part of its agreement with HUD under the Model Cities Act, the City made additional agreements with HUD. It specifically agreed that it retains responsibility for providing municipal services to the housing projects, including fire, police and schools, and has contracted with HUD that the City will provide these services. (Testimony of Mr. Heyward, 12/11/79.)

D. *Matters relevant to CETA.* The City has taken no action to eliminate artificial barriers to employment, including civil service tests, for plaintiffs. Since plaintiffs have proven themselves as Bridgeport Police officers by performing skillfully for as many as ten years, at this point a civil service test requirement, whether or not legal,[4] is wholly artificial.

E. *Matters relevant to Title VII.* All the Housing Police are Black or Puerto Rican. Superintendent Walsh testified that of the 400 Bridgeport Police Department officers 52, or approximately 13%, are minority. Since in addition there are approximately 27 Housing Police officers, termination of all the Housing Police officers would reduce the number of the City's minority police officers by 34% literally overnight.

Although all the persons terminated would be minority, not every minority police officer would be terminated, since some Bridgeport Police Department officers are minority. The classification of police officers into Housing Police officers and Bridgeport Police Department officers nevertheless has a severe disparate impact on minorities, in that no whites are now adversely affected by the classification. The City is fully aware of the racial impact of its classification. It has suggested no legitimate ends of public policy that the classification and the unfavorable treatment of the Housing Police might serve. On the contrary, the only apparent reason for the less favorable pay and conditions of the Housing Police is the weak economic

---

**3.** The pertinent language of this regulation is set out in the text in connection with the discussion of standing under the Model Cities Act, *infra.*

**4.** See text acc. nn.20–21 *infra.*

position of minorities, which enables the City to hire them at below-market wages.

F. *Additional evidence of discrimination.* The City's employment practices with respect to its Housing Police were condemned by its own affirmative action plan statement as long ago as 1976. That plan found it to be an instance of the City's deficient employment practices *toward* minorities that "the City has failed to provide an acceptable conduit and supportive procedure to channel these qualified [Housing Police officers] into the regular police force." PX 81 at 106.

This Court has previously found that the City has a deplorable reputation for racial discrimination in employment. *Association Against Discrimination in Employment v. Bridgeport,* 454 F.Supp. 751, 757 (D.Conn.), *vacated and remanded,* 594 F.2d 306 (2d Cir.), *opinion on remand,* 479 F.Supp. 101 (D.Conn.1979).

Although the City has asserted that its rules require that plaintiffs take a civil service test, in competition with the general public, to become Bridgeport Police Department officers, the City in the case of a white employee did not enforce such a requirement. In 1957 it hired one Florence Jepson as a "police investigator." The evidence does not reveal all of Mrs. Jepson's duties, but it appears that for at least part of her tenure as an investigator she worked as a jail matron. Twelve years later, the City created the position of police woman and gave a competitive examination for that job. Mrs. Jepson was ineligible to take the 1969 test because of her age, and she did not take the test. She nevertheless was given the position of police woman, which entailed a substantial salary increase from her former job and a change of duties from work as a matron to the full range of police officer duties.

Plaintiffs have not been accorded the same opportunity to become police officers without taking a test. The City's claim that Mrs. Jepson's case is distinguishable because she was ineligible to take the 1969 test does not in fact justify the difference in treatment since the City would hardly claim that if plaintiffs were ineligible to take the police officer test they would therefore automatically be made police officers. In fact one of the plaintiffs, Frank Davis, was disqualified from taking the 1974 police officer test because he was over age, DX 502, but the City has not made him a Bridgeport Police Department officer. The City claims also that Mrs. Jepson was offered the position of police woman because its duties were similar to those of her prior position. But it appears that the Housing Police perform duties at least as similar to those performed by Bridgeport Police Department officers as did Mrs. Jepson.

These factors and the matters reviewed above, along with the City's blatant disregard for its own civil service rules [5] and CDA 11, which it specifically endorsed and agreed to follow, leave the Court no alternative to the conclusion that the City has acted intentionally and in bad faith.

## CONCLUSIONS OF LAW

I. *Implication of a Private Right of Action and Standing.*

A. *The Model Cities Act.*

*Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) established the following criteria for implication of a private right of action: (1) Is the plaintiff among the class for whose particular benefit the statute was created? (2) Is there any indication of legislative intent either to create or to deny a private right of action? (3) Is implication of a private remedy consistent with the underlying legislative scheme? (4) Is the cause of action one traditionally relegated to state law? 422 U.S. at 78, 95 S.Ct. at 2087.

(1) Are the plaintiffs among the class for whose particular benefit the statute was created? Among the stated purposes of the Model Cities Act were the implementation of programs to alleviate "the concentration of persons of low income in older urban

5. *See id.*

areas" by increasing cities' supplies "of adequate housing for low- and moderate-income people," and in particular "to expand housing, job, and income opportunities" for such persons and in such areas. 42 U.S.C. § 3301. The statute also provided that to be eligible for federal assistance under the Act, a city's plan must provide "maximum opportunities for employing residents of the area in all phases of the program, and enlarged opportunities for work and training . . . [and] make marked progress in reducing . . . underemployment and enforced idleness . . . ." 42 U.S.C. § 3303(a)(2). The statute authorizes the Secretary of HUD to establish "additional requirements . . . related and essential to the specific provisions of" the Act. 42 U.S.C. § 3303(a)(6).

■ Perhaps realizing that Congress's exhortations might be of little assistance to the beneficiaries of the Model Cities Act without further specification, the Secretary promulgated CDA (Community Development Act) Letter Number 11 in November, 1970. This regulatory letter, entitled "Model Cities Resident Employment and Training Requirements," sets forth HUD requirements under § 103(a) of the Model Cities Act, 42 U.S.C. § 3303(a). CDA 11 § 2c provides:

> In the case of public employment generated in components of the comprehensive city demonstration program, financed in whole or in part by supplemental or other HUD funds, such jobs will be incorporated into the community's regular civil service system within a reasonable period of time not to exceed two years from the point that positions were filled. Actions to accomplish this will be initiated in each community within six months of the date of issuance of this Letter. Such positions will be filled through a Model Neighborhood resident recruitment and training system in conformity with the policies of this Letter and the positions will carry full public employee rights and benefits.

It appears quite clear to the Court that § 2c is "related and essential" to the purposes of 42 U.S.C. §§ 3301 and 3303(a), and there-fore is within the authority delegated to the Secretary by § 3303(a)(6). Without the requirement of CDA 11 that cities assimilate public employees hired under the Act into the regular civil service system, the statute's goal of providing "enlarged opportunities for work and training [and] . . . reducing . . . under-employment" would likely be met only temporarily if at all.

If the statute itself left any doubt that plaintiffs here are intended beneficiaries of the Model Cities Act, CDA 11 clearly resolves any such doubts in the plaintiffs' favor. And the evidence clearly establishes that the hiring and funding procedures followed in this case made CDA 11 § 2c applicable. *See, e. g.,* PX 26–29.

(2) Is there any indication of legislative intent either to create or to deny a private right of action? There is little evidence in the statute itself of any legislative intent to create a specific right of action on the part of persons in the situation of the plaintiffs in this case. However, there is no evidence of any intent to deny a private right of action either. But as in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), common sense seems to suggest implication of a private right, especially in the posture of this case. The only administrative remedy available under the Act was the termination of federal funds, a draconian measure that would surely harm the intended beneficiaries of the Act as much as the non-complying recipients of the funds. Such a remedy usually will be invoked only in response to the most egregious violations of the statute; a private remedy is therefore necessary as a less drastic and often more efficient means of enforcing the statute. And in this case the administrative remedy is unavailable, since the Model Cities Act has expired, making termination of funds an empty threat. Accordingly, I conclude that this second requirement for implication of a private right of action is met in this case.

(3) Is implication of a private right consistent with the underlying legislative scheme? The factors cited above in support

of the conclusion that the first two criteria have been satisfied in this case apply with equal force here, and I conclude that implication of a private right here is wholly consistent with the underlying purposes of the legislative scheme.

(4) Is the cause of action one traditionally relegated to state law? The answer in this case is clearly negative. The areas of civil rights and employment discrimination are hardly areas of the law that traditionally have been relegated to state law. The traditional source of the rights asserted by the plaintiffs in this case has been the fourteenth amendment to the United States Constitution and later, as evidenced by this suit, federal statute.

■ In view of the foregoing discussion, plaintiffs have standing to sue under the Model Cities Act. *See also Economic Development Corp. v. Model Cities Agency,* 519 F.2d 740, 743 (8th Cir. 1975); *Bouchard v. Washington,* 514 F.2d 824 (D.C.Cir.1975); *North City Area-Wide Council, Inc. v. Romney,* 428 F.2d 754, 757 (3d Cir. 1970); *Feliciano v. Romney,* 363 F.Supp. 656, 670–2 (S.D. N.Y.1973). There can be no doubt that plaintiffs have suffered and are suffering injury in fact as a result of defendants' actions. *Cf. Association of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ B. *CETA.* The discussion above concerning the Model Cities Act applies with equal force to CETA,[6] but additionally is buttressed by the following statutory provision:

> The existence of remedies under this section shall not preclude any person, who alleges that an action of a prime sponsor or of any other recipient violates any of the provisions of the chapter or the regulations promulgated under the chapter, from instituting a civil action or pursuing any other remedies authorized under Federal, State, or local law.

29 U.S.C. § 816(*l*). *See also Hark v. Dragon,* 611 F.2d 11 (2d Cir. 1979).

II. *Laches and Time Limitations.*

■ A. *Laches.* The City claims that plaintiffs are barred by laches from asserting any claims under the Model Cities Act. The Court finds this argument unconvincing. The elements of the laches defense are delay and acquiescence by the plaintiff, and prejudice to the defendant. *See* 11 Wright & Miller, Federal Practice and Procedure: Civil § 2946 at 420 (1973). The City began receiving Model Cities funds for the Housing Police in 1971, and CDA 11 allowed it well into 1973 to incorporate the plaintiffs' positions into the regular civil service system. The delay, then, between the accrual of plaintiffs' cause of action and the filing of this suit is at most four years. During those four years the City first acquired Model Cities funds with which to pay the plaintiffs, then in 1975 funded them itself, and in 1976 obtained CETA funding for them. The use of CETA funds, approximately 3 years after plaintiffs' cause of action accrued, resulted from the City's determination that it was no longer financially able to pay the plaintiffs.

Even if a four-year delay can be considered significant enough to support a defense of laches (assuming the other conditions of the defense were met), plaintiffs' failure to sue earlier may have resulted just as well from the realization that one cannot draw blood from a stone as from acquiescence. And indeed, the City has not pointed to any signs of acquiescence by the plaintiffs.

The third requirement for a finding of laches is prejudice to the defendant. Here the defendant has not made any specific claims of prejudice. The City may actually have cause to be pleased with the delay, since the number of Housing Police at the institution of this action was (and is now) little over half their number in 1974, and the intervening time gave the City a greater opportunity to devise a plan conforming to the requirements of the Model Cities Act if it were so inclined.

---

**6.** For the text of the pertinent section, see n. 15 *infra.*

■ Accordingly, since I am not at all persuaded (a) that any delay here is sufficiently significant to support the defense of laches, or (b) that the plaintiffs acquiesced in any of the defendants' violations of their statutory and constitutional responsibilities, or (c) that the defendants were prejudiced in any way, I conclude that plaintiffs' case is not barred by laches.

B. *Time Limitations Under Title VII.*[7] The City claims that plaintiffs are barred from presenting any claims under Title VII that arose more than 180 days prior to April 20, 1978, the date plaintiffs received their right-to-sue letters from the EEOC. The basis of this assertion remains obscure. Plaintiffs alleging an unlawful employment practice that occurred in a state "which has a State . . . law prohibiting the . . practice . . . and establishing or authorizing a State ˙ . . . authority to grant or seek relief from such practice," 42 U.S.C. § 2000e–5(c), have a minimum of 21 months from the occurrence of the alleged act of discrimination in which to file suit. This period is computed as follows:

Within 300 days of the alleged incident the plaintiff must file a complaint with the EEOC, having filed a complaint with the appropriate state agency at least 60 days

7. 42 U.S.C. § 2000e–5 provides as follows:

(c) In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed [with the Commission] . . . by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law.

. . .

(d) In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged. (e) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged

unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency. (f)(1) . . . If a charge filed with the Commission . . . is dismissed by the Commission or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference un-˙ der subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.

earlier.[8] 42 U.S.C. § 2000e–5(e). The Commission then notifies the state agency of the complaint and allows the state agency at least 60 days to act on the complaint. 42 U.S.C. § 2000e–5(d). Then if the Commission has not resolved the matter or instituted suit within 180 days of the period allowed the state agency,[9] it must notify the person aggrieved, who then has 90 days within which to file suit. 42 U.S.C. § 2000e–5(f)(1).

With respect to the City's argument, there is nothing in the statute to suggest a bar to claims arising more than 180 days from receipt of the right to sue letter. Rather, the period between filing with the EEOC and receipt of the right to sue letter will vary from case to case; it is in most cases wholly out of the aggrieved person's control, and so neither can nor does constitute a statute of limitations.[10] The limitation periods, rather, are the 300-day period within which one must file with the EEOC, and the 90-day period within which one must file suit. Plaintiffs' amendment of their complaint to include the Title VII claims was within the 90-day period.

As to the 300-day period, I cannot conclude that § 2000e–5 bars any portion of plaintiffs' claims, at least so far as the issue of liability is concerned. It is the law of this Circuit that "a plaintiff may defeat a time bar to a Title VII civil suit by asserting subsequent identifiable acts of discrimination related to a time barred incident." *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 105 (2d Cir. 1978), *citing Egleston v. State Univ. College at Geneseo,* 535 F.2d 752 (2d Cir. 1976); *Noble v. Univ. of Rochester,* 535 F.2d 756 (2d Cir. 1976); *Weise v. Syracuse Univ.,* 522 F.2d 397 (2d Cir. 1975). The Court in *Smith* held untimely a filing with the EEOC over 11 months after the alleged act of discrimination occurred. Plaintiff argued there that the occurrence of further discriminatory acts after the filing cured the untimeliness. The court rejected this argument because the plaintiff had neither filed an amended charge to cover the subsequent acts nor "filed an initial charge within the time frame of § 2000e–5(e) as to certain enumerated acts within an alleged discriminatory pattern." 571 F.2d 102 at 105. The instant case, on the other hand, involves an ongoing practice of discrimination. It thus presents a situation analogous to that in *Egleston v. State Univ. College at Geneseo, supra,* where the court held timely an EEOC filing eight months after the plaintiff received notice of her allegedly discriminatory termination, where plaintiff continued working for defendant at an allegedly discriminatory rate of pay, through the date of filing with the EEOC.[11]

The policy of discrimination in this case existed both before and within the 300 day period prescribed by § 2000e–5(e). The plaintiffs' filing with the EEOC therefore was timely. Furthermore, it encompasses the manifestations of discriminatory practice that occurred more than 300 days before the filing since the discrimination here constitutes a continuing violation of Title VII. *Acha v. Beame,* 570 F.2d 57, 64 (2d Cir. 1978); *Weise v. Syracuse Univ., supra,* 522 F.2d at 408–12; *see also Guardians Ass'n v. Civil Serv. Comm'n,* 466 F.Supp.

---

8. Simultaneous filing, as in this case, is permitted so long as the EEOC defers to the state agency for the appropriate period. Love v. Pullman Co., 401 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). This Court deems the EEOC's issuance of a right to sue letter its certification that it has complied with all statutory and regulatory prerequisites to issuance of the letter, including the required deference to the state agency.

9. This period starts to run at the time of filing if there is no appropriate state agency.

10. A plaintiff whose own actions are responsible for the unreasonable extension of this period may, however, be barred by laches. See Boone v. Mechanical Specialties Co., 609 F.2d 956 (9th Cir., 1979) (plaintiff's refusal of right to sue letter and of EEOC assistance for seven years held to constitute laches).

11. The court relied alternatively on the alleged continuing acts of discrimination and on the fact that plaintiff's discharge was not consummated when she received notice that her contract would not be renewed but at the later time (which was within the period prescribed by § 2000e–5(e)) when her contract expired.

1273, 1278–80 (S.D.N.Y.1979). The City, of course, is not liable for violations of Title VII that occurred before March 24, 1972, the date Title VII became applicable to municipalities. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 356–7, 97 S.Ct. 1843, 1865, 52 L.Ed.2d 396 (1977); *Acha v. Beame, supra; Guardians, supra,* 466 F.Supp. at 1276–7. Proof of pre-1972 discrimination, however, is admissible in support of an inference that the discrimination continued, *Hazelwood School Dist., supra,* 433 U.S. at 309 n.15, 97 S.Ct. at 2742 n.15; and the City may be liable for post-1972 perpetuation of pre-1972 discrimination. *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Back pay liability, however, "shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C. § 2000e–5(g).

■ C. *42 U.S.C. §§ 1981 & 1983.* The defendants maintain that plaintiffs' claims under these statutory provisions arising before April 25, 1974, are barred by the statute of limitations. This Court must look for the relevant limit to the most clearly analogous period of limitations provided by State law. *Johnson v. Railway Express Agency,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). Connecticut's three-year tort statute of limitations, Conn. Gen.Stat. § 52–577, applies to civil rights actions. *Williams v. Walsh,* 558 F.2d 667, 670 (2d Cir. 1977). However, since this case involves a course of discrimination continuing into the statutory period, the statute does not bar plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983. *Williams v. Norfolk & Western Ry. Co.,* 530 F.2d 539, 542 (4th Cir. 1975); *Macklin v. Spector Freight*

*Systems, Inc.,* 156 U.S.App.D.C. 69, 84, 478 F.2d 979, 994 (D.C.Cir.1973) (Wright, J.); *Woodard v. Virginia Bd. of Bar Examiners,* 420 F.Supp. 211, 214 n.3 (E.D.Va.1976).[12]

III. *The Federal Defendants.* (The United States Department of Labor, the United States Department of Housing and Urban Development and their Secretaries).

■ Plaintiffs admitted that the federal defendants are guilty of no wrongdoing, and have introduced no evidence tending to show any liability on the part of these defendants. Accordingly, the Court finds for the federal defendants on all counts of the complaint.

IV. *The Bridgeport Housing Authority.*

■ A. *Title VII and 42 U.S.C. §§ 1981 & 1983.* Assuming arguendo that the Bridgeport Housing Authority is an employer of the plaintiffs for the purpose of Title VII analysis, *cf.* 42 U.S.C. § 2000e(a) and (b), it is difficult to see any theory on which the Housing Authority can be held liable under the statute. Plaintiffs have not pointed to any other employees of the Housing Authority with whom to compare the plaintiffs for purposes of either disparate treatment or disparate impact analysis. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–6 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977). It is therefore impossible to find the Housing Authority liable under Title VII. 42 U.S.C. § 1981[13] clearly bars employment discrimination, *see, e. g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and a showing of disparate impact, *Teamsters, supra,* establishes a prima facie case, *Davis v. Los Angeles County,* 566 F.2d 1334 (9th Cir. 1977), *vacated as moot* 446 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). But difficulty

---

**12.** It may be that although the suit is not barred, the statute limits the scope of the remedy available. But this inquiry can await the Court's opinion on the remedy phase of the case.

**13.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

similar to the Title VII problem arises under this statute. It seems clear that plaintiffs have suffered a deprivation of their rights violative of § 1981; but they have not shown that the Housing Authority is sufficiently responsible for the violation to be liable under that section or § 1983.[14] The parties all acknowledge that the State Labor Board determined the Housing Authority to be plaintiffs' employer, at least for collective bargaining purposes; but the evidence shows that virtually all control over plaintiffs' terms and conditions of employment lies with the City rather than with the Housing Authority. The Housing Authority, therefore, is incapable of actually discriminating against the plaintiffs; and plaintiffs have offered no evidence of either intent or attempts on the part of the Housing Authority or its officers to discriminate or otherwise to deprive plaintiffs of their rights. In fact, the Housing Authority did resolve at one point to establish a housing authority police force pursuant to state law, a proposal that if implemented might have bettered the plaintiffs' position. It does not appear from the evidence whether the Housing Authority's failure to do more on the plaintiffs' behalf was the result of inertia or animus. But in the absence of such evidence the Court will not make the inferences that would be necessary to plaintiffs' case. Accordingly, on the claims based on 42 U.S.C. §§ 1981 and 1983, the Court finds for the Housing Authority.

■ B. *CETA.* Plaintiffs rely for their CETA claim on § 122(f) of the Act, 29 U.S.C. § 824(f).[15] The clear import of this section seems to be to place a burden on the Secretary of Labor and on "prime sponsors" under the Act. There is no evidence in this case that the Housing Authority is a prime sponsor as defined in § 101(a) of the Act, 29 U.S.C. § 811(a), and the plaintiffs have suggested no other basis for holding the Housing Authority liable under CETA. Accordingly, on the CETA claim, the Court finds for the Housing Authority.

■ C. *Model Cities.* The facts pertinent to the Housing Authority's obligations under the Model Cities Act have been set out above. Of particular importance is the reference in the Housing Authority's Model Cities Contracts with the City to CDA 11. The contracts appear to place the burden of compliance with CDA 11 and other relevant laws and regulations on the Housing Authority. This was in spite of the fact that the Housing Authority's power actually to effect compliance with the regulation has always been dubious at best, since the Housing Authority has no control over the City's Civil Service Commission, no power to enact the controlling city ordinances, and no money with which to ensure equal treatment of the Housing Police. Nevertheless, the Housing Authority bound itself, if it was not already so bound simply by the existence of the regulation, to attempt compliance with CDA 11. Furthermore, I consider the findings of the State Board of Labor Relations in *City of Bridgeport v. Housing Police Local 1303*, Case No. MPP–3081, Dec. No. 1492 (Feb. 1, 1977), *appeal dismissed*, No. 115665 (C.P. Jan. 31, 1978), persuasive, if not binding as a matter of law, that the Housing Authority at least at some relevant times held itself out to be and was an employer of the Housing Police. I conclude that as such, the Housing Authority had a duty at least to *attempt* to effect compliance with CDA 11. I conclude

---

**14.** Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**15.** The Secretary shall assure that prime sponsors have undertaken, or will undertake, analyses and reevaluations of job descriptions and, where feasible, revisions of qualification requirements at all levels of employment, including civil service requirements and practices relating thereto, in accordance with regulations prescribed by the Secretary, with a view toward removing artificial barriers to public employment (as defined in section 802 of this title) of those whom it is the purpose of this chapter to assist.

that the Housing Authority is liable to the plaintiffs for its failure to make any significant such attempts.

## V. *The City of Bridgeport and its officers.*

■ A. *Title VII.*[16] Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) makes it unlawful for an employer

(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin; or

(2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, . . . or national origin.

Title VII outlaws two fundamental types of discrimination: employment policies that have a "disparate impact" on minorities and those that constitute "disparate treatment."

[In disparate treatment cases, t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .

[Disparate impact cases] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive . . . is not required under a disparate-impact theory.

*International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–6 n.15, 97 S.Ct. 1843, 1854–1855, 52 L.Ed.2d 396 (1977).

■ Under both theories plaintiffs have the initial burden of proving a prima facie case. In a disparate impact case, "a plaintiff need only show that the facially neutral standards in question . . . are discriminatory in effect . . . ." *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786 (1977). The defendant may rebut by proving that "the challenged requirements are job related . . . ."[17]

Under a disparate treatment theory a plaintiff's prima facie case consists of a showing that the defendant "purposefully treated [minorities] less favorably than white persons," *Teamsters, supra,* 431 U.S. at 335, 97 S.Ct. at 1854, or a showing of disparity between the treatment of minorities and the treatment their qualifications would lead one to expect. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).[18] This prima facie showing raises an inference of discriminatory motivation. *Id.* at 577, 98 S.Ct. at 2949. The defendant may rebut the plaintiff's prima facie case by showing a

---

**16.** Plaintiffs have satisfied the jurisdictional prerequisites to suit under Title VII, having filed complaints with the Connecticut Commission on Human Rights and Opportunities and the EEOC in August 1976 and received their Notice of Right to Sue in April 1978.

**17.** The plaintiff may overcome this rebuttal by showing "that other selection devices without a similar discriminatory effect would also 'serve the employer's legitimate interest in "efficient and trustworthy workmanship." ' " *Id.,* quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). *See also* Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971).

**18.** In *Furnco,* 438 U.S. at 575, 98 S.Ct. at 2948, the court endorsed the following statement of the prima facie case from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted):

[Plaintiff must show] (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Of course the instant case is not a hiring case, as were *Furnco* and *McDonnell-Douglas,* but the foundations of the analysis are the same.

non-discriminatory reason for its actions that sufficiently dispels any inference of discriminatory motivation. *Id.*

### 1. *Disparate Impact*

*The Disparity.* · The essence of plaintiffs' claim of disparate impact is that the classification of police officers in Bridgeport into Bridgeport Police Department officers and Housing Police officers has a discriminatory impact on minorities. The members of the Bridgeport Police Department have job security and opportunities for promotion,. and receive higher pay and better benefits; the Housing Police receive lower pay and fewer benefits, and have little opportunity for promotion and no job security. The disproportionate impact of the job classification on minorities is clear: all of the Housing Police are minorities, whereas 87% of the members of the Bridgeport Police Department are white. The City claims that (1) the distinction is one of employment status and not of race, in that plaintiffs' jobs are different and are not within the City's civil service system as are the Police Department positions; and (2) the Housing Police cannot validly be compared to the Bridgeport Police Department officers because the Housing Police are not "employees" of the City within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b) and (f). The facts as established at trial and enumerated above, however, clearly demonstrate the errors in the City's position.

 a. *The Housing Police are employees of the City.* Section 701(f) of the Act, 42 U.S.C. § 2000e(f), defines an employee as "an individual employed by an employer." In the absence of any further direction from the statute or its legislative history, the Court will construe those terms in accordance with common law principles. *Smith v. Dutra Trucking Co.,* 410 F.Supp. 513, 516 (N.D.Cal.1976), *aff'd* 580 F.2d 1054 (9th Cir. 1978). The essential characteristic of the employer-employee relationship is

the employer's power or right to control the employee's conduct. *Id.,* citing *NLRB v. Phoenix Life Ins. Co.,* 167 F.2d 983, 986 (7th Cir.), *cert. denied,* 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). The selection or hiring of the employee, power of dismissal, and payment of wages are also relevant factors. 53 Am.Jur.2d *Master & Servant* § 2 (1970). It is clear from the facts set out above that the City is the plaintiffs' employer; it determines and pays their salaries, controls their conduct on the job, directs their assignments and alone possesses the power to fire them.[19]

The City has argued that the State Labor Board's conclusion in *City of Bridgeport v. Bridgeport Housing Police Local 1303,* supra, that the Housing Authority was plaintiffs' employer is dispositive of this issue. This argument is unpersuasive. First of all, there is nothing in Title VII to suggest that Congress had any intention of deferring to such determinations by state agencies. Indeed, such deference could soon emasculate Title VII by giving state and local governmental units the power to define themselves out of its scope.

Second, the State Labor Board apparently relied for its decision in part on the provision of Conn.Gen.Stat. § 8–44b that the members of a Housing Authority Police Force "shall be employees of such housing authority." This provision, however, is irrelevant to the status of the Housing Police, because the Housing Police force was not created pursuant to the state statute. Rather, the plaintiffs are "special police officers" on the payroll of and under the control of the City. Moreover, even if the Housing Police were a § 8–44b Force, the supremacy clause would subordinate the provisions of the state statute to conflicting provisions of Title VII.

Third, the State Labor Board's decision, regardless of its infirmity, held only that for purposes of the duty to negotiate the

---

**19.** The Housing Authority's negotiations with the Housing Police and "agreement" to pay them wages equal to those of the Bridgeport Police Department officers hardly suggest what the City maintains, that the Housing Authority

should be considered the sole employer of the Housing Police to the exclusion of the City when it is the City that possesses complete control over the plaintiff's wages.

Housing Authority was plaintiffs' employer. The limited nature of this determination precludes the inference, whether or not such an inference would be valid in other respects, that the City is not an employer of the Housing Police.[20] Furthermore, federal law recognizes the doctrine of joint employers. *See, e. g., Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

 It thus appears beyond dispute that the City is plaintiffs' employer for the purposes of Title VII.

b. *Civil service classification.* The City maintains that the only means by which plaintiffs can become entitled to pay and benefits equal to those received by members of the Bridgeport Police Department is to compete with members of the general public in the civil service examination for entrance to the Police Department and be hired as patrolmen.

Regardless of one's view of the plaintiffs' rightful status at the moment, the City's own civil service rules preclude requiring plaintiffs to take an entry-level examination. Section 6 of the Civil Service Provisions of the Charter of the City of Bridgeport (PX 49) has provided as follows since 1949:

In the event that the City absorbs or assumes operation of an enterprise or function from, and theretofore conducted or performed by, the federal government, or any agency thereto, the state or another governmental sub-division thereof, or any private individual, business or agency, those employees who have been con-

tinuously engaged in such enterprise or function so taken over for not less than one year and who may be considered essential to its operation by the authority or officer of the city who has supervision of such new enterprise or function and the personnel director, shall be retained without preliminary or performance tests, and shall be regarded as holding their positions under probationary appointment, and shall thereafter be subject in all respects to the provisions of this act.

In this case the City has assumed the federal government's function in funding the Housing Police;[21] the members of the Housing Police have been continuously engaged as Housing Police officers for well over a year;[22] and any decision by Superintendent Walsh or the Civil Service Commission that the Housing Police are not essential to the City or that its members are not essential to the operation of the Housing Police clearly would be a gross abuse of discretion in light of the overwhelming evidence to the contrary introduced at the preliminary hearings and at trial.[23]

c. *Similarity of work performed by the Housing Police and the Bridgeport Police Department officers.* I have already found that the plaintiffs' training and duties are identical in all significant respects to those of the Bridgeport Police Department officers. The major difference lies in the fact that the Housing Police have inferior arrest powers. This is a result of their classification as "special police," a classification that has no basis in their qualifications, and no relationship to the work they do.[24]

---

**20.** The Court notes also that by the time the State Labor Board issued its decision, the Housing Police had dropped the City as a party in the proceeding before the Board. Thus any finding by the Board that the City was plaintiffs' employer would have been gratuitous.

**21.** In 1975 the City funded plaintiffs' positions itself; it is now paying the plaintiffs out of federal funds within the City's control.

**22.** The Civil Service Commission's Rule V provides that the probationary period shall be not less than three months nor more than six months.

**23.** With regard to the City's obligation to dispense with its would-be requirement of examination for the Housing Police, see also the discussion concerning CETA and Model Cities *infra*; text acc. nn.4–5 *supra*.

**24.** Police Department Order No. B–103, PX 16 at 2, lists the following as the exclusive duties of special police officers:

Guards, patrols and polices assigned area and building in part or full time work; polices park area, playgrounds, athletic fields and events; guards area and buildings such as the zoo, concessions, beaches, against vandalism, and objectionable persons; keeps order, locates parents of lost children, enforces

Clearly plaintiffs' case of disparate impact violative of 42 U.S.C. § 2000e–2(a)(2) is complete. The City has "segregate[d] [and] classifie[d] [plaintiffs] in [a] way which would deprive or tend to deprive [them] of employment opportunities or otherwise adversely affect [their] status as . . . employee[s] . . . ." And the adverse impact of the City's action falls entirely on the plaintiffs, all minorities; no whites are adversely affected. Moreover, the quondam "justification" of business necessity in the form of inadequate financial resources is unimpressive in light of the City's current surplus.

2. *Disparate Treatment.* The facts relevant to disparate treatment analysis have been set out above. In sum, the plaintiffs' qualifications and duties are identical to those of Bridgeport Police Department officers, and yet plaintiffs have no job security, lower pay, and fewer benefits. The Police Department is 87% white, and the Housing Police are 100% minority. The disparity in treatment is clear, and easily supports an inference of discriminatory motive.

Allowing for differences resulting from the fact that *McDonnell Douglas, supra,* was a hiring case and the instant case involves disparity of treatment in the terms and conditions of employment, satisfaction of the *McDonnell Douglas* test in this case is clear. The *McDonnell Douglas* prima facie case alone raises an inference of discrimination, *Furnco Construction Corp. v. Waters, supra,* 438 U.S at 577, 98 S.Ct. at 2949, which the employer can dispel by " 'articulat[ing] some legitimate nondiscriminatory reason for the employee's [treatment],' " *id.* at 578, 98 S.Ct. at 2950, quoting *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. This the City has failed to do.

The excuse of lack of funding is presently unpersuasive, since the City has a surplus

and approximately fifty funded vacancies in the Police Department. Overwhelming evidence, including the mayor's admissions, PX 39, precludes the City from claiming that the plaintiffs are superfluous or replaceable: as a practical matter, police protection for the housing projects in Bridgeport depends entirely on the security of plaintiffs' employment. Indeed, as I have found above, not only is the City's treatment of the plaintiffs without any "legitimate, nondiscriminatory" business reason or rational basis in public policy, it is in the words of plaintiff's counsel,

> a self-inflicted wound to the City of Bridgeport, an irrational action that is only made explicable by the observation that all the persons terminated are Black or Puerto Rican. The logic of this observation is reinforced by the fact that the other victims of the proposed terminations—the residents of the housing projects—are also predominantly minority.

Plaintiffs' post-trial brief at 22.

The City has also argued, as if this were a hiring case, that its exemplary hiring of minorities in the Police Department rebuts any inference of discrimination in its treatment of the Housing Police. On its face the argument has little appeal; on the facts it is wholly meritless. In the first place, this is not a hiring case: plaintiffs were hired pursuant to a model cities neighborhood recruitment plan, and have not claimed any discrimination in the hiring process.

Their complaint, rather, refers to discrimination in terms and conditions of employment and lay-offs. The City would have them compete with the general public to *keep* their jobs, a requirement that it does not claim to impose on Police Department officers.[25] Plaintiffs are entitled to equali-

---

ordinances; patrols parking lots, tags for meter violations, checks meters for defects, listens to complaints, incidentally may assist or substitute in specialized work of the particular agency to which assigned as for example, in cashiering work at the parking garage.

The police protection plaintiffs provide for the Housing Authority, a dangerous and high-crime segment of the City, hardly falls within this description.

25. By analogy to the Equal Pay Act, it is not enough that plaintiffs have a theoretical opportunity to receive equal treatment by competing

ty of treatment, not merely a chance to compete for equality.

Second, although it may be true that 50% of the Police Department officers hired since 1973 are minorities, it is also true that these people were hired pursuant to court order and the Department remains 87% white.[26]

The hiring history of the Police Department thus is not very impressive. The City's deplorable reputation as an employer, *Association Against Discrimination in Employment v. City of Bridgeport*, 479 F.Supp. 101 (D.Conn. 1979), and the measures that have been necessary to achieve minimal integration of the Fire Department and the Police Department, *see id.*; *Bridgeport Guardians v. Members of Civil Serv. Comm'n.*, 354 F.Supp. 778, *aff'd in part and rev'd in part*, 482 F.2d 1333 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975), place a very heavy burden on the City if it wishes to rebut the inference of discrimination here.[27] Minority hiring pursuant to court order, where the hiring does nothing to remedy the discriminatory treatment of plaintiffs, is no rebuttal. And even if the City had rebutted plaintiffs' prima facie case, the pellucid evidence of bad faith recounted above [28] would be more than sufficient refutation.

B. *42 U.S.C. § 1981 and 1983.* Municipalities are now subject to suit under § 1983, *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d

Cir. 1980), and § 1981, *Garner v. Giarrusso*, 571 F.2d 1330 (5th Cir. 1978); *Skyers v. Port Authority*, 431 F.Supp. 79 (S.D.N.Y. 1976). The question whether § 1981 bars only purposeful discrimination remains open, *County of Los Angeles v. Davis*, 446 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (dissenting opinion, Powell, J.), although courts have held that employment practices having a discriminatory impact are remediable under § 1981, *see Davis v. County of Los Angeles*, 566 F.2d 1334, 1340–41 (9th Cir. 1977), *vacated as moot*, 446 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), and cases there cited. In any event, the question lacks significance here, since § 1981 clearly does bar employment discrimination, id., and I have found the City's conduct intentional. Further inquiry into the precise delimitations of plaintiffs' case under § 1981 is unnecessary here, where only the issue of liability is before the Court, since "it seems clear that [§ 1981] affords no greater substantive protection than Title VII," *New York City Transit Authority v. Beazer*, 440 U.S. 568, 584 n.24, 99 S.Ct. 1355, 1365 n.24, 59 L.Ed.2d 587 (1975) (dictum), and plaintiffs have not suggested otherwise.

Although plaintiffs have not briefed their § 1983 claim, they have indicated no intention to drop it.[29] The Court concludes that the City is liable under that section for the following reasons. First of all, the City's treatment of plaintiffs clearly constitutes an official policy, and as such satisfies the "state action" requirement of § 1983. *Mo-*

---

for positions in the Police Department. See Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), where the Court held that an employer did not cure the lingering effect of discrimination by opening its higher-paid night positions to women while maintaining the lower-paid day positions, most of which were held by women. "[T]he company could not cure its violation except by equalizing the base wages of female day inspectors with the higher rates paid the night inspectors." 417 U.S. at 206, 94 S.Ct. at 2233–2234.

26. Compare this figure with the figure of 59% for the white percentage of the population of the City as a whole.

27. These factors are permissible support for the inference of continuing discrimination, Hazelwood School Dist. v. United States, 433 U.S. 299, 309 n.15, 97 S.Ct. 2736, 2742 n.15, 53 L.Ed.2d 768 (1977), and as such strengthen the plaintiffs' prima facie case.

28. *See* text acc. n.5 *supra.*

29. On the other hand, plaintiffs' post-trial brief and proposed findings and conclusions omitted any reference to the claims that the City violated §§ 1982 and 1985, which were included in the complaint. Since plaintiffs offered little or no evidence that would tend to show the applicability of either section, I consider any claims under these sections intentionally waived.

*nell, supra*, 436 U.S. at 690–95, 98 S.Ct. at 2035–38. Liability under § 1983 for a violation of the Equal Protection Clause depends upon proof of discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *De jure* discrimination, however, is by nature intentional, *Acha v. Beame*, 438 F.Supp. 70, 79 (S.D.N.Y.1977), *aff'd*, 570 F.2d 57 (2d Cir. 1978), *citing Washington v. Davis, supra*, and *Keyes v. School Dist. No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); it exists where an official policy "expressly treats a class of persons in a less favorable manner," *id.* That is the case here: the City has developed an official policy of treating the all-minority Housing Police differently from the Bridgeport Police Department members,[30] and has made its discriminatory animus evident. The City therefore is liable under § 1983.

C. *Model Cities.* The requirements of the Model Cities Act and CDA 11 are unequivocal. CDA 11 required the City, as part of its "comprehensive city demonstration program," to incorporate plaintiffs' positions into its regular civil service system within two years. The City has failed to do so. Having concluded that the plaintiffs are appropriate parties to enforce the requirements of the statute and the regulation, I conclude now that the City's failure to fulfill the duty that the law so clearly imposes upon it renders it liable to the plaintiffs. *See Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

D. *CETA.*[31] Section 122(f) of the Act, 29 U.S.C. § 824(f), provides:

> The Secretary shall assure that prime sponsors have undertaken or will undertake, analyses and reevaluations of job descriptions and, where feasible, revisions of qualification requirements at all levels of employment, including civil service requirements and practices relating thereto, in accordance with regulations prescribed by the Secretary, with a view toward removing artificial barriers to public employment (as defined in section 802 of this title) of those whom it is the purpose of this chapter to assist.

The City is a prime sponsor under § 101(a), 29 U.S.C. § 811(a). Testimony of Mr. Gilmore, 3/7/79 at 42. Section 3(3) of the Act, 29 U.S.C. § 802(3), defines artificial barriers to employment as "limitations in the hiring, firing, promotion, licensing, and other terms and conditions of employment which are not directly related to an individual's fitness or ability to perform the duties required by the employment position."

As in the case of the Model Cities Act, CETA § 122(f) clearly imposes a duty upon the City as a prime sponsor. There is no evidence that the City has ever undertaken even to begin fulfilling that duty.[32] Indeed, if it had undertaken an investigation of its civil service provisions, it would have discovered an artificial barrier to employment that does *not* exist in its civil service provision, namely the requirement of an

---

30. The inequality of treatment has two aspects here: one is the City's insistence that plaintiffs take and pass an entry-level civil service examination in order to acquire a chance of receiving the benefits of employment in the Police Department, a requirement that was overlooked in at least one instance of a white person's change of position (a change that was less nominal than it would be here). The other and complementary aspect is the City's policy of providing virtually no benefits to the all-minority group that plaintiffs comprise while providing substantial benefits to an 87% white group that does the same work but has a different name.

31. If CETA requires exhaustion of administrative remedies, plaintiffs' attempts to secure relief through the administrative process satisfy that requirement here.

32. It is plaintiffs' burden to show a breach of that duty. Since this involves proving a negative, I consider plaintiffs' burden met by reference to the City's representations that it is requiring plaintiffs to take an entry-level exam in order to receive job benefits equal to those of the Police Department officers, and by the absence of even a scintilla of evidence indicating an attempt by the City to commence a sympathetic reevaluation of its policies with respect to plaintiffs.

entry-level examination for persons in the plaintiffs' situation. As indicated above, the City is violating its own charter by attempting to impose this requirement on the plaintiffs. A more artificial barrier to employment is difficult to imagine. I conclude that the City is liable to plaintiffs for the breach of its duty under 29 U.S.C. § 824(f).[33]

## ON INTERVENING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### FACTS

Since this Court's decision on liability in this case in which the Court found the City liable to the plaintiffs for its discriminatory employment practices, the Bridgeport Guardians, Inc., and Arthur Carter have intervened as parties plaintiff; the State, County and Municipal Employees Local 1199 and a number of persons[1] eligible for the sergeants' promotional examination that is the subject of the intervening plaintiffs' complaint and of the present motion have intervened as parties defendant.

The intervening plaintiffs, Arthur Carter and Bridgeport Guardians, Inc., are respectively a black male patrol officer in the Bridgeport Police Department who has been certified eligible to compete for promotion to the rank of sergeant, and a non-profit, non-stock corporation having as a principal goal the promotion of equal employment opportunities for members of minority groups. They seek redress on their own behalf and on behalf of all others similarly situated for injuries that have resulted or will result from the defendants' failure to comply with the Court's order in *Bridgeport Guardians, Inc. v. Bridgeport Civil Serv. Comm'n.*, 8 Empl.Prac.Dec. 5270 (D.Conn.) (opinion on remand), *aff'd* 497 F.2d 1113 (1974) (*Guardians I*), an order of the Office of Revenue Sharing, their own affirmative action plan, and a stipulation signed by counsel for the plaintiffs and the defendants in the *Guardians* case, *supra*.[2] Plaintiff intervenors allege that the defendants' conduct violates 42 U.S.C. §§ 1981 and 1983; Titles VI and VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d *et seq.* and 2000e *et seq.*; 31 U.S.C. § 1242; and the thirteenth and fourteenth amendments to the United States Constitution.

33. The Bridgeport Area Manpower Consortium, the local administrator of CETA, is also a named defendant in this case. As the local agent of the Secretary of Labor, this body has the obligation under the § 824(f) to assure that the prime sponsor fulfills its duties. Like the Housing Authority's duty under the Model Cities Act, this duty is rather nebulous. And as in the case of the Housing Authority, there is little if any indication that the consortium had made any effort to make or receive the assurances the statute requires. Since I have concluded that plaintiffs have standing to enforce CETA provisions, and the Consortium has breached its statutory duty, plaintiffs are entitled to enforcement of that duty. Unlike the Model Cities Act and CDA 11, however, this CETA provision does not contain a time limit, and so the value of the plaintiffs' right under this section at the remedy phase may be academic only. But this is no reason to deny the existence of the right.

1. This group presently consists of Gregory Iacovetti, William Gombar, Eugene P. O'Neil, Ward N. Colbree, William Giblin, Robert Fitzgerald, James Remele, Philip Napolitano, Robert Biroscak, Richard Petitte, Cornelius Carroll, Robert Mencel, Arnold Briglia, Leo Krunuski. These persons were all parties to the litigation of Bridgeport Guardians v. Bridgeport Civil Serv. Comm'n., 354 F.Supp. 778 (D.Conn.) *aff'd in part and rev'd in part*, 482 F.2d 1333 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1974) (*Guardians I*), and contend here that both the plaintiffs' and the intervening plaintiffs' claims are barred by the judgment in that case. This contention is without merit. As to liability in this case, these defendants intervened on the stipulation that they were not attempting to relitigate the issue of liability. And as to the remedy, it is difficult to see how Judge Newman's exercise of his discretion in fashioning a remedy in *Guardians I* can be viewed as limiting this Court's discretion as to remedy on a record involving admittedly the same parties, but also differences in facts that have developed over a span of over five years.

2. The stipulation recited, "[i]f the Court enters an order in conformance with the terms of this stipulation, . . . the parties hereto will accept said order as a final judgment of these actions and waive and forgo any right of appeal hereof." The Court never did enter such an order.

Specifically, plaintiff intervenors and the original plaintiffs in this action allege that the examination for promotion to the rank of sergeant in the Bridgeport Police Department is highly likely to have an adverse impact on the minority candidates taking the examination and has not been validated as required by the aforementioned court order and stipulation. They further allege that the defendants acted in bad faith in the choice and development of this examination by actively avoiding compliance with these alleged requirements.

In *Guardians I, supra,* Judge Newman found the defendants liable under 42 U.S.C. § 1983 for racial discrimination in promotional policies and practices in the Bridgeport Police Department. Judge Newman's ruling on remand requiring defendants to. "advise the Court as to the progress being made with respect to both the hiring and promotion remedies" and "validation of all promotion exams to be used in the future," 8 Empl.Prac.Dec. at 5272, was upheld by the Court of Appeals. 497 F.2d 1113 (2nd Cir. 1974).

In June 1976 the defendants administered an examination for the rank of police detective prepared by McCann Associates, Inc. This examination had a discriminatory impact on minority applicants: no minority applicant achieved a passing score; 24% of the white applicants passed. *Bridgeport Guardians, Inc. v. Bridgeport Police Dept.,* 431 F.Supp. 931 (D.Conn.1977) (*Guardians II*). Judge Newman found that 10% of the questions on the exam were not job-related, and another 8% were capable of more than one correct answer. He nevertheless held the examination sufficiently job-related to pass muster under Title VII. *Id.*

In June 1977 the Bridgeport Guardians objected on equal employment opportunity grounds to a proposed police department entry-level examination. To resolve this objection, counsel for the City and for the plaintiffs entered into a stipulation in which defendants agreed *inter alia* to use validated examinations prepared by Dr. John T. Flynn for the next two entry level and promotional examinations.[3] An entry level examination administered by Dr. Flynn in June 1977 resulted in the highest minority pass rate ever achieved on such an examination in the Bridgeport Police Department. Testimony of Mr. Cohen.[4] This examination was upheld as job related in *Armeno v. Bridgeport Civil Serv. Comm'n,* No. 167722 (Conn.Super.Ct. Fairfield Cty., July 28, 1978).

Bridgeport Personnel Director Alan Cohen and the defendants' and the intervening plaintiffs' counsel met with Dr. Flynn in September, 1978, to discuss Dr. Flynn's preparation and administration of a promotional examination for the rank of sergeant. Mr. Cohen testified that he was satisfied at the conclusion of this meeting that Dr. Flynn would provide the City with a job-related examination that would not have a discriminatory impact on minority candidates. Nevertheless, in or around December, 1978, the City advised Dr. Flynn that it would obtain a sergeant's examination elsewhere.

On August 15, 1979, the Office of Revenue Sharing, upon investigation, concluded that the "absence of minorities and females in supervisory ranks is sufficient to establish a prima facie case of discrimination" and ordered the City to submit a plan for increasing female and minority representation in upper level positions in the Police Department. The plan is to "include specific actions taken to develop and implement non-discriminatory promotional policies and/or [*sic*] tests to be utilized by the City." Letter from the Office of Revenue Sharing to Mayor Mandanici.

On November 21, 1979, the Civil Service Commission posted a notice of the sergeants' examination that was to be given on January 26, 1980. PX 3. The notice stated that the written examination would

---

**3.** *See* n.3 & acc. text. *supra.*

**4.** References to testimony are to testimony given at the hearing on these motions for prelimi-

nary injunction held on January 23 and 29, 1980. Exhibits entered in evidence at the hearing are referred to as "PX" (plaintiffs' exhibits) or "DX" (defendants' exhibits).

consist of 100 questions in the following categories:

| | | |
|---|---|---|
| Patrol Related Technical Knowledges | 15 | questions |
| Investigative " " | 10 | " |
| Legal " | 10 | " |
| Supervisory Knowledge & Ability | 25 | " |
| Human Relations " " | 10 | " |
| Deductive Reasoning Ability in Police Situations | 10 | " |
| Observational Ability | 10 | " |
| Reading Comprehension Ability | 10 | " |

The notice also announced the following job requirements: command ability, mental alertness, integrity, industry, resourcefulness and good judgment. It stated that promotion to the rank of sergeant would be based on the following factors in the proportions given: written examination, 6; oral examination, 3; seniority, 1. The City's Civil Service rules require a candidate to score 75% on the written examination in order to be eligible for the oral examination, and hence for promotion.

The written and oral examinations to which the notice refers were prepared by McCann Associates, Inc. In conjunction with the development of these examinations, McCann Associates prepared a "Report to the Bridgeport Civil Service Commission on the Job Analysis of the Police Classes, Detective, Sergeant, Lieutenant, Captain and Inspector." DX 501. This report contains no study or other signs of any attempt to determine the likelihood that the proposed examination will have a discriminatory impact.

All of the examinations prepared by McCann Associates that have been challenged in court have been found to have a discriminatory impact on minority candidates. Testimony of Mr. McCann. Furthermore, the McCann Bridgeport Sergeants' examination consist of test items selected from a bank of such items used by McCann Associates for other civil service examinations. McCann Associates has never undertaken any study to determine whether any of these items have a discriminatory impact on minorities. Indeed, at least one of McCann Associates' police sergeants' examinations has been found to have a discriminatory impact and not to be job-related.[5] *Shield Club v. City of Cleveland*, 8 Empl.Prac.Dec. ¶ 9606 (N.D.Ohio 1974). Approximately half of the test items in McCann Associates' promotional examination for the rank of police sergeant are the same test items that were in the McCann item bank at the time of the Cleveland examination.

In engaging McCann Associates, the defendants did not specify that the test should be free of adverse racial impact or that McCann should provide any evidence that it would not have an adverse impact. Testimony of Mr. Cohen and Mr. McCann. And although techniques exist for validating promotional examinations before they are administered, and both the stipulation cited above and Judge Newman's remedy order in *Guardians I, supra*, apparently contemplated prior validation,[6] the proposed exam-

---

**5.** It is perhaps noteworthy that Mr. McCann claimed in his testimony that all of his examinations had been upheld by the courts that heard the challenges to them, until plaintiffs' counsel brought the Cleveland case specifically to his attention. The Court notes also that this case does not present the first instance in which the probative value of Mr. McCann's testimony was called into question. In Vulcan Society v. Civil Serv. Comm'n., 490 F.2d 387 (2d Cir. 1973), the court concluded:

> The judge was . . . warranted in rejecting the testimony of defendants' expert, Forbes McCann, that . . . [the person who developed the examination in question] had achieved the miracle of stumbling into an examination that bore 'a demonstrable relationship to successful performance of the jobs' without having formulated an adequate

analysis of just what the jobs were or what traits they demanded.

It is arguable that McCann's testimony proved the opposite of what he contended. 490 F.2d at 396.

**6.** The stipulation states, "The parties will, in good faith, cooperate with Dr. Flynn for the purpose of developing job-related, non-discriminatory examinations. Judge Newman's order states that "validation of all promotional exams to be used in the future . . . should be implemented." *Guardians I, supra*, 8 Empl. Prac. Dec. at 5272.

Even if neither the stipulation nor the order does contemplate prior validation, the defendants' actions are still a fairly obvious attempt to use the most discriminatory procedure they might be able to get away with.

ination has not been validated. Testimony of Mr. McCann. The job analysis report that McCann Associates prepared for the City, DX 501, does not constitute or contain a validation study. Testimony of Mr. McCann and Dr. Barrett.

Mr. McCann did testify that his firm would provide the City with a validation study after the examination was administered, and that the validation study would show that the examination is job-related. This conclusion seems at best premature, since McCann Associates has made no attempts to date to validate the examination.

As to adverse racial impact, the only prophylactic measures McCann Associates has taken are (a) showing the test to one black psychologist, (b) providing a list of study materials to candidates,[7] and (c) providing candidates with a booklet of information concerning multiple choice examinations.[8] Such superficial inspection is incapable of revealing the racial impact of an examination, and there is no evidence that circulation of a list of study materials or an instruction booklet reduces adverse impact on minority candidates. Testimony of Dr. Barrett.

McCann Associates intends to determine whether the test items are job-related by showing them to members of an advisory group of supervisory officers from the Bridgeport Police Department while the examination is in progress and asking that group to determine whether the items test material related to the job of police sergeant. Testimony of Mr. McCann. This same advisory group was responsible for selecting the attributes for which the McCann examination seeks to test. DX 501 at 7–8. On the basis of questionnaires the members of this group filled out, McCann Associates selected the knowledges, skills and abilities ("KSA's") to be tested, as set out in the table above.

Mr. McCann was unable to offer any empirical evidence tending to substantiate his firm's judgment that any test item in fact measures the area listed, assuming those areas are appropriate subjects for measurement at all. McCann Associates has performed no study to ascertain whether those who correctly answer any given test item in fact perform better in the dimension that item purports to measure than those who answer it incorrectly. This is in spite of the fact that the questions on the proposed examination were drawn from McCann Associates' bank of test items, and were not drafted specifically for the Bridgeport Police Department sergeants' examination.

McCann Associates apparently does plan, as indicated above, to conduct a validation study of the examination during and after the testing period. The plan is to establish job-relatedness by the content validity strategy. According to Dr. Barrett's testimony, however, the credibility of which is unimpeached,[9] only 35% of the examination topics listed by McCann are capable of validation by this method. The other 65% are attributes or constructs, and can only be validated by the construct validation strategy. The 1978 EEOC Uniform Guidelines on Employee Selection Procedure, 29 C.F.R. §§ 1607.1 to 1607.18, provide that construct validity can be established only by reference to a criterion-related study showing that the selection procedure is validly related to the performance of critical or important work behavior. 29 C.F.R. § 1607.-14D(3)–(4). McCann Associates has not performed and does not propose to perform either a criterion-related validity study or a construct validity study in connection with the proposed examination.

---

7. Assuming that these materials would be of some value to any candidate, a dubious assumption according to Dr. Barrett's testimony, the fact that the materials were provided to members of the Police Department and not to the Housing Police obviously could operate to the unfair advantage of the Housing Police if this Court's remedy order as to them should include lateral entry into the Police Department with retroactive seniority.

8. Mr. McCann testified that if a minority candidate with access to the study materials failed his (unvalidated) examination, that would show that the candidate was "inferior."

9. Cf. n.6 supra.

It thus appears that the job-relatedness of the examination has at best been left largely up to chance, although McCann Associates has concluded that the examination is job-related. DX 501 at 57. Dr. Barrett testified on the basis of the information available to him and to the Court that the examination described by McCann Associates in Exhibit 501 and in the Civil Service Commission's notice of the sergeants' examination is likely to have an adverse impact; and nothing in Exhibit 501 suggests that McCann Associates has done anything to minimize this likelihood.

Defendants have offered no evidence of any business necessity to justify the use of the McCann test. Indeed, any such justification is difficult to imagine, since defendants had available to them the services of a testing expert who they were satisfied would prepare a job-related examination that would not have an adverse impact.

By selecting a screening device likely to have a disparate impact on minorities, by failing to secure prior validation, and by rejecting the services of an expert who the City's personnel director acknowledges could have developed a job-related examination that would not have an adverse impact in favor of a tester with a reputation for examinations that do have an adverse impact, the defendants have exhibited bad faith and a purpose and intent to discriminate on the basis of race in promotions. One of these factors standing alone perhaps would not warrant a finding of bad faith; perhaps in another case these factors in the aggregate would not warrant it. But in this case the City's actions, viewed in the context of previous litigation involving the Guardians and of the current litigation involving the Housing Police, as well as the total absence of minority representation in the Police Department's supervisory ranks, fully support the conclusion that the City of Bridgeport is utterly averse to acting in good faith toward minority employees in the Police Department.

Plaintiffs have shown substantial likelihood that the proposed examination will have an adverse impact on minority candidates. They have also shown a significant lack of attempts on the part of defendants to ensure the job-relatedness of the examination. In this situation if the proposed examinations were given, litigation concerning its validity would certainly ensue. And it appears likely that the outcome of that litigation would be a rejection of the examination as invalid. Defendants argue that this would vindicate the plaintiffs' rights. But the opportunity to take another examination cannot heal the stigma attaching to failure on the initial examination, as even Mr. McCann admitted in his testimony. This injury would be irreparable.

## CONCLUSIONS OF LAW

### I. *Jurisdiction.*

Defendants claim the Court lacks jurisdiction over plaintiffs' Title VII action because "plaintiffs have not received a right to sue letter from the EEOC concerning this exam." Defendants' Proposed Findings and Conclusion, 2/4/80, at 4. As to the original plaintiffs in this action, the Housing Police, the assertion is without merit: the proposed examination is clearly a part of the continuing pattern and practice of discrimination alleged in plaintiffs' complaint, and the Court entertains no doubt that its equitable powers include the capacity to enjoin the examination pending issuance of the remedy order in this case.

As to the intervening plaintiffs, it is true that they have not received a right to sue letter. But there is no indication that Congress intended in setting the jurisdictional requirements for an action under Title VII to limit the court's power to grant necessary temporary equitable relief from clear violations of the Act, providing the plaintiffs can meet the requirements for issuance of a preliminary injunction. *See, e. g., Garza v. Texas Ed. Foundation*, 565 F.2d 909 (5th Cir. 1978); *McNail v. Amalgamated Meat Cutters*, 549 F.2d 538, 542 n.10 (8th Cir. 1977); *Drew v. Liberty Mutual Ins. Co.*, 480 F.2d 69 (5th Cir. 1973), *cert. denied*, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974).

The Court also has jurisdiction under 28 U.S.C. § 1343 to consider the intervening plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983. On the issue of intentional and purposeful discrimination, see *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), plaintiffs have shown sufficient bad faith on defendants' part to support more than the finding of probable success on the merits necessary for issuance of a preliminary injunction, see *Caulfield v. Board of Ed.*, 583 F.2d 605, 610 (2d Cir. 1978).

## II. *Plaintiffs' Entitlement to Preliminary Injunctive Relief.*

The standard for issuance of a preliminary injunction in this Circuit is well settled: "[T]here must be a showing of possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Caulfield v. Board of Ed., supra.* Plaintiffs have satisfied this standard under both of the alternative tests.

As noted above, the intervening plaintiffs have shown possible irreparable injury. The harm involved in this case is more than the mere injury to reputation for which the Supreme Court denied redress in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The stigma resulting from failure on an invalid examination is both an individual emotional trauma and an apparently objective badge of inferiority [10] inseparably linked to the failing examinee's race or national origin, thus going to the very heart of Title VII, 42 U.S.C. § 1981, and the fourteenth amendment. The fact that the examination may later be declared invalid and the injured persons accorded an opportunity to take a valid test cannot erase the stigma: the fact will remain that a disproportionate number of minority candidates failed an examination that a disproportionate number of white males passed. Mere defamation can be remedied by retraction of the offending statement. But the social and emotional harm flowing from an invalid promotional examination will remain beyond the time an opportunity to take a valid examination is afforded. The scores on the first examination, even if not used, cannot be erased.

Success on the merits of a Title VII claim depends upon a showing that the examination will have a discriminatory effect,[11] *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786 (1977); the plaintiffs have shown this is likely. Defendants may rebut this prima facie showing by proving that the examination is job-related. *Id.* This they have not done; and plaintiffs have shown that the likelihood of their being able to do so is slim. Assuming, however, that defendants are capable of making such a showing, plaintiffs may overcome the rebuttal by showing that a non-discriminatory or less discriminatory examination would serve the City's "legitimate interest in 'efficient and trustworthy workmanship.'" *Id.*, quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). This plaintiffs have already shown with Mr. Cohen's testimony that he was satisfied that Dr. Flynn could provide a job-related examination that was not discriminatory.

As to the claims under 42 U.S.C. §§ 1981 and 1983, plaintiffs' success may depend upon a showing of intentional discrimination. *Washington v. Davis, supra.*[12] The Court has already found the City liable for such conduct with respect to the Housing Police. And as indicated above, the City's conduct with respect to the examination in

---

**10.** *Cf.* n.9 *supra.*

**11.** The Court assumes only for the sake of limiting the discussion here, that plaintiffs would proceed on a discriminatory impact theory. This assumption is not intended to preclude in any way any proof related to discriminatory treatment, *see, e. g.*, Furnco Construc- tion Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

**12.** *But see* Owen v. City of Independence, Summary of oral argument, 48 U.S.L.W. 3445 (Jan. 15, 1980).

question demonstrates the requisite intent in this context also.

■ Thus the first *Caulfield* test is satisfied. The second test is less stringent regarding success on the merits, but required also a balancing of hardships. The possible injury to plaintiffs if the examination goes forward would be irreparable. The hardship to the defendants would consist only in delay and perhaps the expense of procuring a new examination. The City is not in a position to complain of either. It has not given a sergeants' examination since 1972. And it has no one to blame but its own officials for the additional expense, since it is the City's bad faith actions and intentional discrimination that have resulted in the City's present position. As to the intervening defendants, the hardship consists in delay only. There can be no vested right to take a discriminatory examination,[13] and the delay contemplated is hardly significant in comparison to the eight year delay between the last sergeants' examination and the proposed one. Accordingly, the Court concludes that plaintiffs are entitled to the preliminary relief they seek.

## PRELIMINARY INJUNCTION

In light of the above findings of fact and conclusions of law, based upon consideration of the testimony, exhibits and documentary submissions presented by the parties, it is hereby ORDERED

That the defendants, their agents, employees and all persons acting in concert and active participation with them are enjoined and restrained from using the herein referenced examination prepared by McCann Associates, Inc., as a selection procedure for promotions to the rank of police sergeant until such time as they furnish to this Court adequate evidence of advance validation of that or another suitable examination.

That the defendants shall furnish to this Court adequate evidence that the selection procedure to be used will not have an adverse impact on minorities.

That the defendants shall disclose any such evidence to plaintiffs' and intervening plaintiffs' counsel of record and to plaintiffs' and intervening plaintiffs' expert, who are and shall be enjoined from disclosing such evidence or information in any manner without prior permission from this Court.

That such submissions shall be made within ninety days of the date of this Order.

That the defendants are further enjoined from taking any action that would prejudice the rights of the plaintiffs and intervening plaintiffs to equal opportunity in employment with regard to promotion to the rank of sergeant.

That the defendants forthwith notify their agents, employees and all persons acting in concert with them of the terms of this Order.

---

**13.** The situation presented here must be distinguished from the case where the results of a discriminatory examination have already been announced. In the latter situation a court may limit the remedy granted in order to avoid defeating the justifiable expectations of those who received passing scores. *See, e. g.,* Association Against Discrimination in Employment v. City of Bridgeport, 594 F.2d 306, 310 (2d Cir. 1979).